IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 24, 2021 Session

## STATE OF TENNESSEE v. CINDY B. HINTON

**Appeal from the Circuit Court for Cheatham County**
**No. 18762        Suzanne Lockert-Mash, Judge**

_____

### No. M2020-00812-CCA-R3-CD

_____

The Defendant, Cindy B. Hinton, appeals her convictions for vehicular homicide by intoxication and vehicular homicide by reckless driving. The Defendant argues that the evidence was insufficient relative to the Defendant's intoxication and that the court erred by imposing a sentence of eleven years in confinement. After a thorough review of the record and applicable law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Michael J. Flanagan, Nashville, Tennessee, for the appellant, Cindy B. Hinton.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Jack T. Arnold, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from a February 29, 2016 car crash on Interstate 24 (I-24) in which Brandi Vandiver, a Kentucky resident commuting to Nashville, was killed when the Defendant failed to brake in response to a long line of slowed and stopped traffic. The January 2019 term of the Cheatham County Grand Jury charged the Defendant by presentment with vehicular homicide by intoxication and vehicular homicide by recklessness. See Tenn. Code Ann. §§ 39-13-213(a), 55-10-401. At trial, the State sought to prove that relative to Count 1, the Defendant was intoxicated by various prescription medications. Relative to Count 2, the State's theory of guilt was that the Defendant was applying mascara at the time of the crash.

At trial, Dennis Vandiver, the victim's husband, testified that on February 29, 2016, the victim left home early that morning to go to work. While Mr. Vandiver was traveling to his workplace, one of the victim's coworkers, Don Smallwood, sent Mr. Vandiver a text message indicating that Mr. Smallwood had been speaking with the victim by telephone when he "lost contact" with her.

Danyelle Zeigler Ferrigno testified that on February 29, 2016, around 8:00 a.m., she was driving eastbound on I-24 at mile marker 29 when she came upon slowed traffic due to a car accident near mile marker 31. Ms. Ferrigno noted that she was in the far left lane on the three-lane highway containing stopped traffic. As Ms. Ferrigno slowed, she saw a white car in the center lane "barreling past" her. Ms. Ferrigno realized that the car was not braking and would not have time to stop. Ms. Ferrigno saw the car collide with a gray car, which "spun and then shot across the interstate" before coming to a stop on the left shoulder. The white car ultimately stopped on the right shoulder of the interstate.

Christopher Welborn and Jason Spriggs, who were traveling together in a work vehicle, also witnessed the crash while they were slowing down in traffic due to the earlier crash. Mr. Welborn noted that he saw "a big cloud of smoke and debris" and a car "roll back across the interstate." Relative to the damage to the victim's car, Mr. Welborn stated that "the rear end was smashed all the way up to the front doors almost." Mr. Welborn and Mr. Spriggs stopped because Mr. Welborn had some first aid training and kept a "medic bag" in his truck, and Mr. Spriggs was a former military medic. After expending a great deal of effort to extract the victim from her car and render aid, Mr. Spriggs and Mr. Welborn discovered that the victim had no pulse; they recognized cerebrospinal fluid coming from the victim's nose, which indicated to them that she could not be helped. It was undisputed that the victim died at the scene; her death certificate reflected that the cause of death was multiple blunt force injuries.

Mr. Welborn acknowledged that in a statement to police, he had noted that the sun was in his eyes as he drove. He agreed, though, that in spite of the sun he had avoided striking other vehicles. Mr. Spriggs similarly testified that the relevant stretch of highway was sunny in the mornings and that they kept sunglasses in their work truck for this reason. He agreed that Mr. Welborn had decelerated before the first crash due to the otherwise slowed traffic.

Mr. Spriggs testified that after the paramedics arrived, he went to the Defendant's car, where the Defendant was sitting while speaking to a truck driver. When Mr. Spriggs asked if the Defendant was okay, the Defendant asked, "[I]s she going to be okay[?]" The Defendant also asked the truck driver if he could find her cell phone. According to Mr. Spriggs, the Defendant said, "I was texting my kids when all hell broke loose or something."

Laura and Patrick Oswald testified that they also witnessed the crash; Ms. Oswald stopped her car and called 911, and Mr. Oswald was part of the effort to render aid to the victim. Mr. Oswald testified regarding the extensive damage to the victim's car.

Tennessee Highway Patrol (THP) Trooper Sharon Bagnall testified that on February 29, 2016, she responded to the scene of the crash.[1] Trooper Bagnall took a number of photographs, which were received as exhibits and reflected that the victim's dark gray Toyota Corolla sedan was located on the left shoulder of the interstate; the front of the car sat perpendicular to a guard rail and was facing the lanes of travel. The rear portion of the car was destroyed all the way to the area behind the front seats. What was left of the rear fender, including the victim's license plate, rested on top of the guard rail. The Toyota also had damage to the front fender and headlight on the passenger's side, and the hood was raised. Photographs of the car's interior showed a quantity of blood on the upper half of the driver's seat.

Additional photographs reflected that the Defendant's white Ford Crown Victoria sedan was located on a grassy area on the right shoulder of the interstate and was almost perpendicular to the road. The front portion of the sedan, which was facing the road, had a detached front fender, the hood was raised, and the headlights were missing. The driver's side of the sedan had scrape marks at the front wheel well, and a dent and more scrape marks were present on the rear driver's-side door. Among other personal effects pictured inside the car were a large plastic zipper-top bag of makeup on the driver's seat and a large black smear or stain that was visible on the deflated airbag.

Trooper Bagnall testified that she spoke to the Defendant at the scene; the Defendant was sitting in the driver's seat of her car, and a paramedic was sitting in the backseat and holding the Defendant's head steady. The Defendant told Trooper Bagnall that the sun had been in her eyes and that she had pulled down the driver's-side visor in search of her sunglasses. Trooper Bagnall collected the Defendant's driver's license and prescription medication bottles from the Defendant's purse. Trooper Bagnall did not ask the Defendant to perform field sobriety tests because she was being medically treated.

Trooper Bagnall identified three pill bottles recovered from the Defendant's purse; she noted that the first bottle contained "a mixture of different types of pills," which she indicated was not typically permitted for prescription medication. Trooper Bagnall affirmed that "some sort of stain" was present on the driver's-side airbag and that an eyelash curler and mascara wand were found in the front driver's-side floorboard. Trooper Bagnall stated that when she interviewed the Defendant at the hospital, the Defendant asked her about the bag full of makeup, indicating that the bag "was new, and

---

[1] Trooper Bagnall's police cruiser recording was received as an exhibit, but it was not included in the appellate record.

it was expensive, and she'd like to have it back." Trooper Bagnall and the Defendant generally discussed the crash, but Trooper Bagnall did not detail the conversation further.

On cross-examination, Trooper Bagnall testified that she did not observe any behavior at the scene indicating impairment in the Defendant, and she affirmed that had any such signs been present, she would have included them in her police report. Trooper Bagnall stated that "a law" existed prohibiting people from keeping more than one type of prescription medication in the same bottle. Trooper Bagnall stated that she spent between twenty and thirty minutes at the hospital interviewing the Defendant and that she did not look for signs of impairment in the Defendant at that time because she had been told that the Defendant was given additional medications after her blood was drawn.

THP Sergeant Jeffery Buchanan testified that he visited the Defendant in the hospital to obtain her consent for a blood draw. He affirmed that the Defendant seemed to understand the content of the consent form and that she signed it. The form reflected that the blood draw was performed at 10:30 a.m.

Josh Ethridge, a former detective and drug investigator, testified that he generated a "Controlled Substance Database Report" related to the Defendant. The report was entered as an exhibit and reflected that in January and February 2016, the Defendant filled prescriptions for Alprazolam, Tramadol, Hydrocodone, "Dextroamp sacc," and "Amphetamine Salt Combo."

Tennessee Bureau of Investigation Special Agent Joe Castelbuono, an expert in blood toxicology analysis and the effects of drugs on human performance, testified that he tested a sample of the Defendant's blood. The Defendant's blood tested negative for alcohol; however, the Defendant's blood tested positive for the following substances: 0.12 micrograms per milliliter of an amphetamine with the brand name Adderall; .06 micrograms per milliliter of fluoxetine that had the brand name Prozac; norfloxacin, a metabolite of fluoxetine; 9 nanograms per milliliter of diazepam that had the brand name Valium; 23 nanograms per milliliter of nordazepam, a metabolite of diazepam; 44 nanograms per milliliter of alprazolam that had the brand name Xanax; metoprolol that had the brand name Lopressor; less than 0.05 micrograms per milliliter of doxylamine, an over-the-counter sleep aid that had the brand name Unisom; and less than 0.10 micrograms per milliliter of dextromethorphan, an over-the-counter cough suppressant.[2] Special Agent Castelbuono testified that according to the Defendant's medical records, the hospital did not administer any of the medications for which the Defendant's blood sample tested positive.

---

[2] Some of the substances included a quantified amount and others only noted a positive test. Our list of substances is consistent with the information provided on the laboratory report exhibit and Special Agent Castelbuono's testimony.

Special Agent Castelbuono testified that Adderall made a person "more alert, more aware" and improved focus when taken as prescribed. He noted that dextromethorphan, the cough suppressant, did not have side effects "unless you take a lot of it." He stated that Prozac and Lopressor caused drowsiness, dizziness, and lightheadedness if a person had not taken it previously, but that after a person took them for a period of time, the side effects generally decreased. Special Agent Castelbuono stated that Valium, diazepam's metabolite nordazepam, and Xanax were all benzodiazepines, which were central nervous system depressants. He added that the intent of the medications were to calm and relax a person and that if a person were more relaxed, "everything [was] a lot more slowed down." He stated that side effects included dizziness or drowsiness. Special Agent Castelbuono said that a driver taking benzodiazepines could exhibit slowed reaction time, trouble "maintaining lane discipline" as a result of difficulty focusing on more than one task at a time, and cognitive impairment in decision making and reacting to "a threat in front of [the driver]."

Special Agent Castelbuono testified that when a person took a stimulant and a depressant simultaneously, the effects did not "cancel each other out," but rather depended on the individual's reaction and which drug was "psychoactive" at the time. As an example, he described "a situation where [the person] may be feeling alert from the Adderall, but still simultaneously have [the person's] central nervous system depressed. And now [the person is] slowed down and . . . having trouble focusing. It's just what's active at that moment."

On cross-examination, Special Agent Castelbuono testified that apart from the Adderall, the levels of the various medications in the Defendant's blood were within therapeutic levels. He agreed that he did not know which medications were active in the Defendant's body at the time of the accident or whether the Defendant was impaired.

On redirect examination, Special Agent Castelbuono testified that the therapeutic range of a medication referred to the amount that a doctor would commonly prescribe "to give the intended result." He agreed that such a range might include a patient who was not expected to drive and that the therapeutic range did not "tell us anything about whether someone [was] able to drive." He agreed that benzodiazepines were designed to calm and relax a person and could also be prescribed as a sleep aid, which was inconsistent with safe driving.

THP Trooper Jameson Benefield, an expert in crash reconstruction and crash data retrieval (CDR) analysis, testified that he analyzed data from a "black box" in the victim's Toyota, as well as physical evidence at the crash scene; he noted that the Defendant's car was too old to contain a black box. Trooper Benefield stated that several signs existed to indicate that the Defendant never braked before the initial impact with the victim's car.

He said that no "shadowing" or skid marks were present on the road. Similarly, the damage to the respective vehicles and a "fluid trail" on the scene reflected that the Defendant's car drove over the top of the victim's car and "defeated [its] mainframe," crushing the car without making "contact with the strongest parts of the Toyota." Trooper Benefield noted that if the Defendant had braked, her car would have traveled underneath the victim's back fender. Finally, the brake pedal on the Defendant's car did not reflect any marks from a shoe, which typically occurred when a driver was pressing the brake pedal during a crash. Trooper Benefield noted that he examined the Defendant's brake and gas pedals to eliminate the possibility of the crash's having been caused by a malfunction and that the brake system appeared to be working properly. Trooper Benefield further noted that according to the damage to the victim's car, the Defendant hit the victim at "interstate" speed. He stated that the back seat of the victim's car had been pushed forward until it was in direct contact with the front seats.

Trooper Benefield agreed that the Defendant's rearview mirror was turned toward the driver's seat and that no sunglasses were found in the car. Trooper Benefield confirmed that the Defendant's airbag reflected a "stain or black spot" and that an eyelash curler and mascara brush with a "screw-on top" were found in the floorboard. Trooper Benefield held up the mascara brush to the stain and noted an "imprint of the brush" in the stain. He opined that at the time the airbag was deployed, the mascara brush was "directly in front of it." Trooper Benefield stated that he was about the same height as the Defendant, and he took a photograph while sitting in the driver's seat showing that the rearview mirror was turned toward him and "hit [him] about the chin area."

Trooper Benefield testified that the CDR on the victim's Toyota recorded the state of the vehicle for five seconds before the crash and that the victim had not engaged in "hard braking" during that time. In addition, the victim was traveling about twenty miles per hour five seconds before the crash and had slowed to about nine miles per hour at the time of the collision. Trooper Benefield noted that the crash occurred on a straight, flat stretch of road with a clear line of sight between one half of a mile to one mile. He noted that neither car collided with other motorists during the crash, which indicated that traffic was moving to some degree. Trooper Benefield stated that less than two seconds before the impact, the victim accelerated and steered to the left, which indicated that the victim may have seen the Defendant's car approaching and attempted to avoid her. He denied finding any indication that the victim's brakes or lighting system were not functioning, although he noted that because the victim was accelerating just before the crash, he would not have expected to find evidence that the victim's brake lights were illuminated at the time of impact. Trooper Benefield stated that if the Defendant had braked and gone underneath the Toyota, the victim would have been better protected because the steel frame of the cars would have made contact, which would have "ke[pt] everything from coming in on [the victim]."

On cross-examination, Trooper Benefield acknowledged his note in the crash reconstruction report that the sun was rising "in the face of traffic" at the time of the crash. He agreed that Mr. Spriggs and Mr. Welborn indicated that the sun was "irritating" that morning. He opined, though, that the speed limit only applied to "ideal conditions" and that if a driver could not see due to sunlight, the driver "should slow down." Trooper Benefield noted that Mr. Spriggs and Mr. Welborn did not indicate that the sun was "so blinding that they couldn't see" and that Mr. Spriggs was able to stop. When asked why he had not testified about the angle of the sun on direct examination, Trooper Benefield stated that based upon his experience, which included frequently driving on the stretch of the interstate in which the crash occurred, he had never been prevented from keeping a safe distance from a car in front of him due to his being blinded by the sun. He acknowledged that a mascara tube corresponding to the recovered mascara brush was not found in the Defendant's car. He further acknowledged that he did not order testing of the Defendant's airbag or the mascara brush to determine whether the substance on each item was, in fact, mascara. He noted, though, that he observed what appeared to be dried mascara on the brush.

On redirect examination, Trooper Benefield stated that because no evidence existed to indicate that the Defendant braked, he concluded that "[d]istracted or impaired driving" were contributing causes of the crash. Trooper Benefield was unaware of any existing laboratory test to identify mascara.

On recross-examination, Trooper Benefield clarified that when a crash occurred with "no input by the driver, that [was] consistent with somebody that's either distracted or impaired . . . [or] a combination of the two." He reiterated that the evidence of impairment, for his purposes, consisted of the lack of driver input.

Based upon this proof, the jury found the Defendant guilty of vehicular homicide by intoxication in Count 1. At the sentencing hearing, several of the victim's relatives testified and submitted victim impact statements regarding the devastating effect of the victim's death on their close-knit family, including Mr. Vandiver, the victim's husband; Larry and Judy Banister, the victim's parents; Rita Banister, the victim's aunt; Shane Banister, the victim's brother; Lori Banister, the victim's sister-in-law; and Devan and Brycen Banister, the victim's nephews. Brad Vivrette, Mr. Vandiver's best friend, and Mothers Against Drunk Driving also submitted statements to the court. Mr. Vandiver and Judy Banister noted in particular that the Defendant had never shown remorse or taken responsibility for her actions in the four years since the crash. Mr. Vandiver noted his belief that the Defendant did not "even care" about the victim's death and acted as if she "fe[lt] inconvenienced by the whole thing." Mrs. Banister wrote that the Defendant had "run free" for four years and that she needed to "go away to jail, away from her family,

away from her children." All of these individuals asked the court to impose a sentence in confinement.

THP Trooper Shane Moore testified that on December 11, 2013, he was conducting a traffic stop when the Defendant drove past him and failed to move into the far lane in spite of the opportunity to do such. After Trooper Moore concluded the traffic stop, he saw the Defendant pulling into a gas station, where he activated his blue lights and stopped her. Trooper Moore smelled burnt marijuana emanating from the vehicle and asked the Defendant about the odor; she admitted that she had smoked marijuana just before entering the car. After being read the implied consent form, the Defendant refused a blood test. The Defendant also performed "poorly" on field sobriety tests.

Marley Pfeffer, the driving under the influence (DUI) coordinator for the 23rd Judicial District, which contained Cheatham, Dickson, Houston, Humphreys, and Stewart counties, testified that she obtained certified records from Montgomery County related to the December 11, 2013 traffic stop of the Defendant. Ms. Pfeffer also testified that between 2010 and 2014, nine vehicular homicide convictions were obtained in the judicial district and that one or two of those cases were from Cheatham County. Between 2015 and 2019, there were nineteen charged vehicular homicides resulting from twenty-three deaths; six were from Cheatham County, and seven of the cases were pending. Ms. Pfeffer agreed that the population and number of DUI cases in Cheatham County had increased in recent years. Ms. Pfeffer stated that ten of the twenty-eight vehicular homicide cases resulted in a prison sentence. She said that two convictions had been obtained in Cheatham County for vehicular homicide since 2014. Between 2015 and 2019, three such convictions were obtained in Cheatham County, including the Defendant's convictions.

Presentence report officer Teresa Geas testified that she interviewed the Defendant as part of her investigation. The Defendant told Ms. Geas that she had tried marijuana in 1979 at age sixteen but did not like it and that she had never used other illegal drugs. Ms. Geas agreed that the Defendant did not mention having smoked marijuana in 2013 or having taken a medication for which she did not have a prescription at the time of the crash in this case.

The presentence report indicated that the fifty-six-year-old Defendant had no criminal history. She reported that she had been diagnosed with anxiety, depression, post-traumatic stress disorder, and attention deficit disorder; she had several chronic health conditions causing chronic pain. The Strong-R Assessment stated that the Defendant was a low risk to reoffend, although it classified the Defendant's "attitudes/behaviors" and "family" factors as moderate risk "target factors."

Upon questioning by the trial court, Ms. Geas testified that the Strong-R Assessment noted her opinion that the Defendant "verbalize[d a] need to change her lifestyle but [was]

not taking specific steps for change." In addition, she agreed that the Defendant's "behavior and verbalizations demonstrate[d] connection not yet made between action and consequences." Ms. Geas stated that the assessment reflected her opinion that the Defendant's problem-solving skills were limited because the Defendant did not "underst[and] what she was looking at, what the consequences would be from this action." Ms. Geas did not remember why she noted that the Defendant had committed "other violent acts within . . . her lifetime," but Ms. Geas noted that it was likely due to the nature of the Defendant's charges in this case. Ms. Geas clarified that a notation regarding the Defendant's having left a job for a reason unrelated to the job referred to the Defendant's leaving her employment to be a stay-at-home mother.

Ms. Geas testified that in her opinion, the Defendant denied engaging in criminal behavior and did not take responsibility in this case. Ms. Geas explained, "[S]he never mentioned the victim . . . . Basically she told me she remembered being hit and spinning, and it was a terrible accident, and that's all it was." Ms. Geas denied that the Defendant expressed or showed any remorse. She elaborated, "She had some tears during the interview, but that was because she was telling me she had totaled her dad's car. At no point during the interview did she mention the victim." Upon questioning by defense counsel, Ms. Geas acknowledged the possibility that the Defendant did not mention her remorse upon advice of counsel not to "give any statements."

Upon questioning by the State, Ms. Geas stated that she did not have access to information about the Defendant's 2013 DUI arrest, which had been expunged from the Defendant's criminal record. Ms. Geas said that she would have noted the Defendant's denial of any drug use in light of the circumstances of the Defendant's 2013 arrest; however, Ms. Geas did not know if it would have changed the result of the Strong-R Assessment.

Trooper Bagnall was called as a witness and reiterated the Defendant's having asked for her makeup at the hospital. Trooper Bagnall stated that she was "shocked" that the Defendant was worried about her makeup when the victim had died. Trooper Bagnall said that the Defendant was "visibly upset" at the crash scene but that the Defendant did not seem remorseful at the hospital.

On cross-examination, Trooper Bagnall stated that the Defendant did not verbally express remorse and that she did not know whether the Defendant felt remorse. Trooper Bagnall said that she had worked on twenty cases involving fatal crashes and that the Defendant was the only person who had not shown concern for or asked about the victim.

The Defendant read a statement in which she noted that defense counsel had told her that she was not allowed to reach out to Mr. Vandiver. The Defendant apologized to Mr. Vandiver and the victim's family, stating that she wished she would have died in the

crash rather than the victim. She expressed her gratitude that Mr. Vandiver was "even trying" to forgive her and stated that she was "totally responsible" for his loss. She asked the victim's family to forgive her. The trial court received as exhibits two letters from the Defendant's former co-workers attesting to her character.

Susan Harris, the Defendant's sister, testified that the Defendant was the eldest of three children and that their childhood home was stable and happy. Ms. Harris stated that the Defendant took care of her and their brother and that the Defendant was a wonderful caregiver. Ms. Harris said that the Defendant cared for her aging parents and that the Defendant had a reputation in the community for being a kind, "sweet," and thoughtful person who was the first to offer help when it was needed.

Ms. Harris testified that she had witnessed the Defendant's "profound" remorse for the crash, including numerous times that the Defendant expressed a wish that she would have died instead of the victim. Ms. Harris stated that the Defendant was "a shell of the person that she was before this accident[.]" She noted that the Defendant had missed family functions because she could not get out of bed and that "this [was] just so hard" for the Defendant. She said that the Defendant seldom went anywhere except for work and that the Defendant articulated that "she [could not] hurt anyone at home." Ms. Harris agreed that upon advice of counsel, the Defendant resigned from her job in the event she was incarcerated. Ms. Harris noted that the Defendant loved her job, which included caring for people, and that she wanted to treat her employer fairly.

Ms. Harris requested that the Defendant be granted probation and affirmed that she and her family were willing to assist the Defendant on probation or during her incarceration. Ms. Harris agreed that although the Defendant needed "some type of counseling" and could not afford it, the family would try to "help her with that." Ms. Harris stated that the Defendant was "not a threat to the community" and that she had "stopped taking her medication." Ms. Harris affirmed that the Defendant had passed her drug tests and reiterated that the Defendant was very remorseful.

On cross-examination, Ms. Harris confirmed that the Defendant had stopped taking medications for anxiety and depression and that the Defendant had stopped taking Adderall since she quit her job. Ms. Harris denied that the Defendant needed counseling related to substance abuse; she noted that when she referred to counseling, she meant "therapy." Ms. Harris denied that her opinion of the Defendant's possible substance abuse problem had changed after learning of the Defendant's DUI arrest in 2013. Ms. Harris noted that the Defendant had no illegal drugs or alcohol in her blood on the day of the crash. Ms. Harris stated that she did not know whether the Defendant's blood test showed the presence of a medication for which the Defendant lacked a prescription. Ms. Harris opined that the Defendant was "not a drug user." Ms. Harris said that although Trooper Moore recounted

the Defendant's admission of using marijuana, Ms. Harris did not "know that [the Defendant] said that."

Upon questioning by the trial court, Ms. Harris stated that in the four years since the crash, her family had tried "to some degree" to obtain counseling for the Defendant. Ms. Harris said that although she suggested that the Defendant go to therapy, the Defendant had not done such.

The trial court stated that the Defendant's case was "very serious" and "very emotional" for both the Defendant's family and the victim's family; the court noted that emotion would not be a part of its imposition of a sentence. The court stated that it was considering the evidence presented at trial and the sentencing hearing, the presentence report, the principles of sentencing. The court noted that at the time of the offense, alternative sentencing, including probation, was available in sentences for vehicular homicide, although the legislature had since amended Tennessee Code Annotated section 40-35-303 to eliminate that possibility. The court stated that if the sentence were ten years or fewer, it could consider the Defendant's suitability for probation or an alternative sentence.

The trial court considered the nature and characteristics of the criminal conduct involved and the evidence as to enhancement and mitigating factors. The court found that the Defendant was a Range I, standard offender, who had been convicted of a Class B felony in Count 1, vehicular homicide by intoxication, and a Class C felony in Count 2, vehicular homicide by recklessness. The court noted that the sentencing ranges were, respectively, eight to twelve years and three to six years.

Relative to enhancement factors, the trial court noted that it could consider criminal behavior not resulting in a conviction and applied factor (1). Tenn. Code Ann. § 40-35-114(1). The court found that the Defendant's driver's license had been revoked on April 14, 2014, for violating the implied consent law and that it was reinstated around April 14, 2015, about one year before the incident. The court noted that it did not "take into consideration the testimony by the trooper about any marijuana use or anything of that nature." The court found that the Defendant's behavior "was such that it brought her within . . . the grasp of law enforcement" and that sufficient cause existed to cite the Defendant with a violation of the implied consent law, resulting in the revocation of her license. The court opined "that should have been a wake-up call" for the Defendant that she had a problem that needed to be addressed. The court found "as far as the behavior at that time," it would give it "little," though "some weight[.]"

The court also applied factor (6), that the amount of damage to property sustained by the victim was particularly great, based upon the victim's car being "totally, absolutely destroyed." Tenn. Code Ann. § 40-35-114(6). The court noted that it was only

considering property damage because the victim's personal injuries were elements of the offenses.

Finally, the trial court applied factor (10), that the Defendant had no hesitation about committing the crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(10). The court found that the crash occurred during rush hour and noted that Trooper Bagnall's dashboard camera recording showed many vehicles stopped on the road. The court found that numerous other people were at risk and gave the factor "some weight[.]"

Relative to mitigating factors, the trial court found that none applied. The court noted the Defendant's previous arrest for violation of the implied consent law and the court's consideration of "all principles in sentencing." The court made the following remarks:

> The thing that concerns me most about this case and I take into consideration the testimony at the trial, were the number of drugs that were found in her system. And if I remember correctly, I believe there were three pill bottles found.
>
> In two of the pill bottles, they had the appropriate drugs with the appropriate prescription attached to that. And I believe the third bottle possibly had mixed pills in that. And there was one drug for which there was not a prescription, if I remember correctly.
>
> . . . .
>
> But the amount of drugs that were found, there was Xanax . . . . [T]here was even medicine that's found in cough syrups that make[s] you drowsy.
>
> There was so much in there. And before this point, she had lost her driver's license because there was an issue there in regard to her manner of driving. And it would have been at that point that you should have said, I need to seek some type of counseling.

The trial court noted that the Defendant could have consulted the doctors who prescribed her medications and admitted that she had a problem. The court stated that it also presided over recovery court, in which individuals "have to first admit they have a problem." The court opined that the Defendant did not believe she had a problem. The court noted Ms. Harris's testimony regarding the Defendant's failure to seek counseling. Then, the court stated that although it was not considering the time that had elapsed between the crash and

the trial or the Defendant's having been on bond during that time, the Defendant had not demonstrated to the court that she was willing to "confront the issue that [she had]." The court recognized the ongoing "opioid crisis." The court imposed an eleven-year sentence in Count 1 and a five-year sentence in Count 2, both to serve in incarceration. The court merged the convictions to yield an effective eleven-year sentence in confinement. The court noted that the Defendant was ineligible for probation based upon the length of the sentence. After the motion for a new trial was heard and denied, the Defendant timely appealed.

<u>ANALYSIS</u>

I.      *Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to support the jury's verdict relative to intoxication in Count 1, vehicular homicide by intoxication. She does not challenge the sufficiency of the evidence relative to Count 2, vehicular homicide by recklessness. The State responds that the evidence was sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Vehicular homicide, in relevant part, is "the reckless killing of another by the operation of an automobile . . . as the proximate result of . . . [t]he driver's intoxication[.]" Tenn. Code Ann. § 39-13-213(a)(2). A driver's intoxication may be caused by either alcohol or drugs and includes any substance that "impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess." Tenn. Code Ann. § 55-10-401(1).

In the light most favorable to the State, we conclude that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the Defendant was intoxicated at the time of the crash. Eyewitnesses and the crash reconstruction indicated that the Defendant failed to react to a long line of slowed traffic and hit the victim, who was traveling at about nine miles per hour, at interstate speed without braking. Trooper Benefield testified that the lack of braking was consistent with distraction or impairment, or a combination of both.

The Defendant's blood sample, which was taken about two and one-half hours after the crash, tested positive for five controlled substances and two metabolites of those substances, as well as an over-the-counter sleep aid and cough suppressant. The Defendant had prescriptions for four of the five controlled substances, but she did not have a prescription for diazepam. In addition, according to Special Agent Castelbuono, the amount of amphetamine or Adderall in her blood was above the typical therapeutic range. Although Special Agent Castelbuono could not testify to the effect of this combination of medications on the Defendant at the time of the crash, he generally described that fluoxetine and metoprolol could cause drowsiness, dizziness, and lightheadedness, although these effects decreased with regular use. He also stated that benzodiazepines like diazepam and alprazolam were central nervous system depressants, which caused relaxation, dizziness, drowsiness, slowed reaction time, and that in the context of driving, benzodiazepine use could cause difficulty making decisions, focusing on more than one task at a time, and reacting to threats.

Special Agent Castelbuono testified that when a person took a stimulant and a depressant simultaneously, the effects depended on the individual's reaction and which drug was "psychoactive" at the time. He cited as an example a situation in which a person

-14-

could feel alert from having taken Adderall when, in fact, the person was having trouble focusing because her central nervous system was being depressed by the other medications. Special Agent Castelbuono also noted that a therapeutic range of a certain medication could include an amount that rendered the person unable to drive safely.

In addition, some of the evidence supporting Count 2, vehicular homicide by recklessness, supports the jury's verdict relative to intoxication. The Defendant's failure to react to the stopped traffic while applying makeup using her rearview mirror circumstantially established that she was unable to divide her attention between tasks, an effect of benzodiazepine use. Although the evidence of intoxication was not overwhelming in this case, we conclude that a reasonable jury could have found that the Defendant was intoxicated at the time of the crash and that the victim's death occurred as a proximate result of the intoxication. The Defendant is not entitled to relief on this basis.

## II.    Sentencing

The Defendant contends that the trial court erred in imposing her eleven-year sentence, arguing that the trial court's sentence should not carry a presumption of correctness because the court failed to consider the Defendant's potential for rehabilitation on the record. See Tenn. Code Ann. § 40-35-103(5). The Defendant further argues that that the court misapplied two enhancement factors and that because only one enhancement factor was properly applied, the court imposed an excessively long sentence. The State responds that no error occurred.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; (7) any statement the defendant wishes to make on the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5); Carter, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2) & (4).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210(d)-(f); Carter, 254 S.W.3d at 342-43. Moreover, misapplication of an enhancement or mitigating factor no longer "invalidate[s] the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. Accordingly, this court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10.

First, the Defendant's contention that the trial court did not consider her potential for rehabilitation is without merit. The court noted its concern that the Defendant had not sought any counseling in the four years during which she had been released on bond, despite Ms. Harris's generally urging her to see a therapist.[3] The court remarked on the Defendant's having taken diazepam before the crash, for which she did not have a prescription. The court also discussed the 2013 incident in which the Defendant refused to submit a blood sample in violation of the implied consent law. The court was particularly troubled by the number of drugs in the Defendant's blood after the crash in light of the 2013 incident, which the court noted should have been a "wake-up call" for the Defendant. We note that the court stated twice that it had considered all the purposes and principles of sentencing before reaching its decision.

---

[3] We note that although the trial court characterized Ms. Harris's comments about therapy as evidence of the Defendant's drug abuse problem, Ms. Harris also testified that she did not believe the Defendant abused drugs, but rather needed treatment for other mental health issues like depression.

-16-

Relative to the enhancement factors, the trial court found that three factors applied—that the Defendant had a history of criminal behavior; that the property damage to the victim was particularly great; and that the Defendant had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(1), (6), (10). The parties agreed at oral argument that the property damage to the victim was particularly great and that enhancement factor (6) was properly applied.

Relative to enhancement factor (1), we note that the trial court was permitted to consider the Defendant's expunged arrest.[4] See State v. Karen Marable, No. W2008-02191-CCA-R3-CD, 2010 WL 2553645, at *11 (Tenn. Crim. App. June 24, 2010) (citing State v. Galen Dean Eidson, No. M2000-02390-CCA-R3-CD, 2001 WL 922187, at *5 (Tenn. Crim. App. Aug. 16, 2001) (citing State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999) ("The testimony and evidence of the criminal acts preceding the arrest are admissible as evidence of prior bad acts or evidence of social history even if expungement is later obtained.")); see also State v. Kelley, 34 S.W.3d 471, 481 (Tenn. Crim. App. 2000) ("[T]he criminal acts for which the defendant received diversion can be considered as prior criminal behavior under enhancement factor (1)."). The trial court stated that although it did not consider Trooper Moore's testimony about the Defendant's marijuana use, it did consider generally that the Defendant's conduct while driving put her into contact with law enforcement and that the revocation of her driver's license as a result of the incident should have functioned as a "wake up call." Nevertheless, the trial court stated that it gave this factor little, though some, weight.

As for enhancement factor (10), we note that even if we accepted the Defendant's contention that the elements of vehicular homicide by recklessness include a high risk to human life other than the victim, this argument does not apply to Count 1, vehicular homicide by intoxication. The proof amply supports that the Defendant endangered numerous other people on the interstate; as a result, enhancement factor (10) was appropriately applied to Count 1.

At any rate, we note that the misapplication of an enhancement factor or the application of an improper enhancement factor is not a basis for reversing a sentencing decision so long as the sentence otherwise complies with the purposes and principles of sentencing. Bise, 380 S.W.3d at 709-10; see State v. Christopher Scott Chapman, No. M2011-01670-CCA-R3-CD, 2013 WL 1035726, at *9 (Tenn. Crim. App. Mar. 13, 2013) ("[A] maximum sentence within the appropriate range, in the total absence of any applicable enhancement factors, and even with the existence of applicable mitigating

---

[4] We also note that violation of the implied consent law is civil in nature when the driver's license has not been otherwise revoked or suspended due to a prior DUI conviction. See State v. John D. Henry, No. E2017-01989-CCA-R3-CD, 2018 WL 5279095, at *11 (Tenn. Crim. App. Oct. 23, 2018).

factors, should be upheld as long as there are reasons consistent with the statutory purposes and principles of sentencing") (citations omitted). The trial court properly applied at least one enhancement factor, considered the information mandated by statute, and articulated its reasoning on the record. See State v. John M. Banks, No. M2019-00017-CCA-R3-CD, 2020 WL 5015888, at \*10 (Tenn. Crim. App. Aug. 25, 2020) ("As pointed out by the State, the application of a single enhancement factor can justify an enhanced sentence") (citing State v. Bolling, 75 S.W.3d 418, 421 (Tenn. Crim. App. 2001)). Based upon the circumstances of the offense, the court was justified in imposing a higher in-range sentence than the minimum. The Defendant is not entitled to relief on this basis.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE